**SHELL OIL COMPANY,**
**Plaintiff-Appellee,**

v.

**NELSON OIL COMPANY, INC.,**
**Defendant-Appellant.**

No. 9–47.

Temporary Emergency Court of Appeals.

Argued May 9, 1980.

Decided July 21, 1980.

---

John G. Kester of Williams & Connolly, Washington, D.C., with whom Philip J. Ward, Washington, D.C., and Jerome H. Craig, Warren L. Ettinger and Evelyn Balderman, of Beardsley, Hufstedler & Kemple, Los Angeles, Cal., were on brief, for defendant-appellant.

William O'Brien of Howrey & Simon, Washington, D.C., with whom William Simon and Eugene M. Katz, Washington, D.C., and Max L. Gillam, Philip F. Belleville and Alan B. Clark of Latham & Watkins, Los Angeles, Cal., were on brief, for plaintiff-appellee.

William W. Scott of Collier, Shannon, Rill & Scott, Washington, D.C., was on brief, for amicus curiae.

Before JAMESON, DUNIWAY and ZIRPOLI, Judges.

DUNIWAY, Judge:

Nelson Oil Company (Nelson) appeals from a decision of the district court finding Nelson in violation of the Department of Energy (DOE)'s gasoline allocation regulations, 10 C.F.R. § 211, et seq., awarding to Shell Oil Company (Shell) $617,308.98 in damages, and granting an injunction decreasing Nelson's base period gasoline allocation by 17,936,929 gallons annually. We affirm.

## I. THE FACTS

DOE regulations, 10 C.F.R. Part 211, Subpart F, §§ 211.101 et seq., promulgated under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq., govern the amount of motor gasoline which a supplier is required to allocate and sell to its customers. The allocation amounts are based on the historic or base period use of its customers, with appropriate adjustments. Until the amendment of the DOE regulations in March, 1979, the "base period" for establishing monthly allocations was the corresponding month of 1972. In March, 1979, the base period was changed and currently is the corresponding month during the period November 1, 1977 through October 31, 1978, 44 Fed.Reg. No. 41, 11202 (February 28, 1979).

Nelson is a wholesale jobber of Shell motor gasoline and other petroleum products, and therefore, a wholesale purchaser-reseller, 10 C.F.R. § 211.51. At all relevant times Nelson and Shell have had a supplier-purchaser relationship, 10 C.F.R. § 211.9. Accordingly, Nelson has been entitled to receive gasoline from Shell in accordance with DOE allocation regulations.

As of March, 1976, when Nelson's present owner, John D. Castellucci, acquired Nelson, its adjusted base period gasoline allocation was approximately 494,500 gallons per month, or 5.9 million gallons per year. This was the volume which Shell was obligated to supply to Nelson under the contract entered into by the parties at that time.

Soon after Castellucci acquired Nelson, he began to use DOE upward certification regulations to increase the amounts of gasoline Shell was required to supply to Nelson. Nelson sought and received from DOE numerous orders assigning new wholesale purchasers to Nelson, 10 C.F.R. § 211.12. In each instance, Nelson asked that its allocation of gasoline from Shell be increased to allow Nelson to supply the new customers, 10 C.F.R. § 211.13. As a result of this upward certification procedure, Nelson's annual gasoline allocation from Shell increased by over 33 million gallons. Shell was obliged to and did supply Nelson its full monthly allocation (or allocation fraction) for each month during the period January, 1976 through May, 1979.

Each DOE assignment order issued to Nelson specifies the retail outlet which is being assigned and the allocation volume to be supplied by Nelson to the retail outlet. In applications submitted to DOE by the retail outlets, Nelson, as a prospective new supplier, expressly affirmed that it was a willing supplier of the retail outlet, and that if the application were granted, Nelson would supply to the applicant the volume of gasoline set forth in the application. In

addition, beginning in January, 1977, Nelson certified in writing to Shell that the additional gasoline supplied pursuant to Nelson's upward certification would be used only for the use stated in the application—sales to the retail outlet designated in the DOE assignment order.

This certification by Nelson was required by 10 C.F.R. § 211.13(f), which states:

Such application [for upward certification] shall contain a statement that increased allocations shall be used for the purpose stated in the application, shall not be diverted for other uses; and that if its needs decline, the purchaser shall file an amended application for a downward adjustment to its base period use.

In fact, Nelson did not supply any gasoline to many of the DOE assigned retail outlets. Nor did Nelson return such gasoline to Shell. Rather, Nelson sold large volumes of the gasoline to other retail outlets, including five outlets that Nelson operated which had either no allocation orders or adjusted base period entitlements much lower than the amounts that were actually supplied to them.

The district court found that during the period from September, 1976 through May, 1979, Nelson had either totally failed to supply or had not supplied on a regular basis fifteen DOE assigned retail outlets having an annual allocation of almost 18 million gallons. Nelson did not seek any downward adjustment of any of its certifications during this period.

Shell expressed concern to DOE that Nelson and other jobbers were abusing the regulatory system through the techniques described above. When DOE took no action, Shell filed this action to enforce DOE regulations on February 20, 1979, seeking damages, injunctive relief and a declaratory judgment that Nelson's conduct justified termination of its jobber contract under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.*[1] On April 20, 1979, Nelson filed an answer and counterclaim asserting three violations by Shell of DOE regulations. On Shell's motion, the district court dismissed two of the claims as insufficient as a matter of law, and the third claim, that Shell had redistributed "underlifted"[2] gasoline to Nelson in a discriminatory manner, proceeded to trial.

At trial, the judge ruled in favor of Shell on both the complaint and counterclaim. The district court held that § 211.13(f) of the DOE regulations required that Nelson downward certify to Shell the annual volume of gasoline obtained by Nelson from Shell pursuant to assignment orders on fifteen retail outlets, whose annual allocations Nelson had diverted to other uses. The court held that Nelson's diversion of this gasoline amounted to a willful and blatant violation of the DOE regulations, and that Shell had been injured by it. The court therefore entered an injunction reducing Nelson's annual adjusted base allocation from Shell by the 17,936,929 gallons accounted for by the upward certifications received by Nelson for the fifteen outlets. The court further found that the total amount of gasoline obtained from Shell and wrongfully diverted to other uses was 20,440,695 gallons.[3] It awarded Shell damages of $617,308.98.[4] With regard to Nelson's

1. The claims stated by Shell in its complaint were originally pleaded in a counterclaim against Nelson in an action charging unfair competition brought by Nelson. Shell removed that case to federal court and thereupon filed its counterclaim. That case was remanded to state court in December, 1978. Because federal courts have exclusive jurisdiction over the claims raised by Shell, (Economic Stabilization Act of 1970, § 210, 12 U.S.C. § 1904 note) Shell filed an independent action in federal court following the remand in order to pursue its claims in the proper forum.

2. "Underlifted" gasoline is gasoline allocated to a retail outlet which that outlet does not purchase because of insufficient demand from the outlet's customers.

3. In arriving at this figure, the court reduced the total underdeliveries to the fifteen accounts by 30%, giving Nelson the benefit of the redirection provisions of 10 C.F.R. § 211.06(b)(3)(iii).

4. The court further held that Shell had proper and sufficient grounds to terminate Nelson's jobber contract under Sections 2802(b)(1)(B) and (c)(11) of the PMPA. We do not consider

counterclaim, the trial judge ruled that Shell's method of distributing underlifted gasoline was a fair, proper and rational method of accomplishing such redistribution and fully complied with the applicable regulations.

## II. JURISDICTION

Nelson argues that the central dispute in this case—the application of 10 C.F.R. § 211.13(f) to the situation involved here—was within the primary jurisdiction of the DOE, and that the district court erred in not deferring to this primary jurisdiction. We disagree.

Section 210 of the Economic Stabilization Act of 1970 (12 U.S.C. § 1904, note) provides for a private right of action in federal district courts and states in pertinent part:

> (a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction . . . and/or damages.

Thus, the district court had jurisdiction.

However, jurisdiction in the district court is only a first step in the inquiry into whether an administrative agency has primary jurisdiction over a case. The doctrine of primary jurisdiction does not determine whether the court will ultimately decide an issue, it merely decides whether the court will postpone such a decision to allow an administrative agency to make the initial decision. *See Writers Guild of America v. American Broadcasting*, 9 Cir., 1979, 609 F.2d 355, 363. *See also*, 3 Davis, Administrative Law Treatise § 19.01 at 205 (1958).

When a trial court has jurisdiction over the subject matter of a lawsuit as it did here,[5] the determination of whether to defer to a regulatory agency with concurrent jurisdiction is controlled by a determination as to whether the reasons for the existence of the doctrine of primary jurisdiction will be forwarded by its application. *United States v. Western Pacific R. Co.*, 1956, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126. Uniformity of regulations and the use of the expert and specialized knowledge of the agency are most often cited as the basis for the doctrine. *See Far East Conference v. United States*, 1952, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576.

The doctrine of primary jurisdiction does not apply where the only task facing the district court is to "determine the meaning of words . . . which were used in their ordinary sense and to apply that meaning to the undisputed facts." *Great Northern Railway v. Merchant's Elevator Co.*, 1922, 259 U.S. 285, 294, 42 S.Ct. 477, 480, 66 L.Ed. 943.

Here, the district court found that the regulations, particularly 10 C.F.R. § 211.13(f), were clear, and proceeded to apply them to the fact situation involved. There was no question involved as to the validity or the reasonableness of the regulations, *see Nader v. Allegheny Airlines, Inc.*, 1976, 426 U.S. 290, 304, 306, 96 S.Ct 1978, 1987, 48 L.Ed.2d 643, but merely whether the regulations had been violated, *see United States Tour Operators Ass'n v. Trans World Airlines, Inc.*, 2 Cir., 1977, 556 F.2d 126, 130. Application of the regulation did not require the specialized expertise of the DOE. *See Nader, supra*, 426 U.S. at 304–305, 96 S.Ct. at 1987. Jurisdiction in the district court was proper.

this further holding. Nelson has appealed this portion of the district court's decision to the Court of Appeals for the Ninth Circuit and no disposition has yet been made by that court.

5. Nelson's argument that the district court did not have subject matter jurisdiction over Shell's claim because that claim was identical to the counterclaim remanded to the state court

along with Nelson's unfair competition suit is wrong. Federal courts have exclusive jurisdiction over the claims raised by Shell, *see* note 1, *supra*. Because the state court is unable to consider Shell's counterclaim, it was appropriate for Shell to file an independent action in federal court following the remand in order to pursue its claim in the proper forum.

Nor is this case one in which the agency has primary jurisdiction because of ongoing agency proceedings. The agency proceedings cited by Nelson, while involving downward certification, concern the extension of downward certification regulations to all customers rather than merely to new customers assigned pursuant to § 211.12(e) and § 211.13(c). *See* 44 Fed.Reg. 69963. These rule-making proceedings are not useful in clarifying the already clear regulatory structure of § 211, the violation of which Shell is asserting. Nor is this a case in which pending administrative proceedings consider the issues adjudicated here. Thus, DOE need not be deferred to because of such proceedings.

### III. VIOLATION OF 10 C.F.R. § 211.13(f)

■ Nelson does not challenge the sufficiency of the evidence to support the district court's findings. Rather, it claims that the district court misinterpreted the downward certification regulation. This claim is based on two alternate arguments: First, Nelson argues that no downward certification was required until its "supply obligation" to its retail outlet customers was formally terminated by DOE. Second, Nelson argues that the recently proposed downward certification regulations confirm that there was no such obligation under existing regulations. Each of these arguments is without merit.

10 C.F.R. § 211.13(f) clearly states Nelson's obligations to Shell, its supplier, when applying for an upward adjustment of its allocation based on a DOE assignment. See the regulation, *supra*, page 231.

Moreover, in May, 1977, Nelson filed a Request for Interpretation with DOE with respect to the certification requirement of § 211.13(f). Nelson argued that it was required to certify only that an increased allocation would be used for resale to wholesale purchaser-resellers as a class and that, therefore, downward certification would be necessary only if its *total* needs for gasoline for resale were to decline, and not if its needs with respect to the particu-

lar outlet named in the assignment order declined. In *Interpretation 1978–24*, 43 Fed.Reg. No. 112, 25079 (June 9, 1978), DOE rejected Nelson's contentions, stating that the certification provision of § 211.13(f) applies to a specific volume of product allocated to *each assigned new customer*, and not to broad categories of general uses. Thus, downward certification was required if Nelson's needs to supply any particular assigned location declined.

Nelson's conduct did not change in response to this DOE Interpretation. Nelson argues that its "needs to supply" do not decline until its "supply obligation" to its customer is formally diminished or terminated by DOE. This argument is undercut also by this statement in the DOE Interpretation:

Thus, if the new assigned customer *ceases purchasing* the motor gasoline from it, Nelson argues that the additional product becomes surplus which may be disposed of by Nelson to other firms. . . .
Nelson's construction of § 211.13(f) is incorrect. (emphasis added) 43 Fed.Reg. No. 112 at 25082.

Nelson argues that it had no obligation to downward certify because it was required to hold available the additional volume of gasoline in the event that the assigned customer demanded to be supplied in the future. This argument fails. Section 211.13(f) imposes an obligation to downward certify with no mention of DOE intervention to terminate an assigned customer's allocation. It requires downward certification whenever the applicant's needs to supply a new customer cease or are substantially reduced. This requirement is clear. If a more complicated regulatory scheme had been envisioned, it would have been specified.

Nelson's argument that the upward and downward certification procedures ought to be symmetrical, each triggered by a DOE assignment or reassignment of a retail customer to a wholesale purchaser-reseller, has some appeal in the abstract. However, that appeal rapidly disappears when the downward certification regulation is examined.

Not only does the regulation require downward certification if the wholesale purchaser-reseller's needs decline, with no mention of DOE action as a prerequisite, but it also requires the wholesale purchaser-reseller to certify that the portion of its gasoline allocation which increases because of upward certification will be used for a single purpose—to supply the newly assigned customer. When these two provisions are read together, it becomes obvious that the upward and downward certification regulations are not symmetrical.

This obvious interpretation of the regulation is not in conflict with statements of Nelson that retail outlets regularly purchase from non-assigned wholesalers and that the readjustment in the base period recently adopted condones such action. The downward certification requirement of § 211.13(f), unlike that in the proposed new regulations, applies only to decreases in need attributable to new customers or to increased demand of base period customers assigned to the wholesaler after the base period. In other words, only supply obligations resulting from upward certification are affected by § 211.13(f) downward certification provisions.

It also cannot be argued that Nelson in fact had a continuing supply obligation to serve customers such as its Sav-Mor accounts when Sav-Mor had expressly cancelled Nelson's supply contract and purchased virtually no gasoline from Nelson. Nor can it be argued that Nelson had a continuing supply obligation to retail outlets that were permanently closed, were selling other major brands of gasoline, or had never been supplied by Nelson at all.

Nelson's contention that it could not downward certify because its assigned customers might demand gasoline in the future also fails. Nelson does not show that it could not downward certify with respect to the customers involved and upward certify at a later date if the customer demanded gasoline from Nelson. Furthermore, the evidence shows that Nelson, in one instance, refused to honor the request of an assigned customer for its allocated supply and, in another instance, effectively did the same by imposing unusually stringent credit terms on its offer to supply.

Nelson's alternative reliance on the recently proposed downward certification regulations is similarly unavailing. The proposed rules are described by DOE as "general downward certification provisions," 44 Fed.Reg. No. 235, 69963 (December 5, 1979), and would require downward certification with respect to base period customers as well as newly assigned customers whose assignment was accompanied by upward certification. Rather than suggesting that there was no downward certification procedure in the existing regulations, the DOE's Notice of Proposed Rulemaking explicitly recognized the § 211.13(f) downward certification requirement:

> 10 C.F.R. 211.13(f), the only current provision dealing with downward adjustments is limited in scope. It applies where a wholesale purchaser-reseller that has received an upward adjustment to its base period use based on an increased supply obligation to one of its purchasers subsequently terminates or significantly reduces its supply obligations to that purchaser.

This statement does not support the narrow view of the downward certification requirement suggested by Nelson. By referring to a supply obligation terminated or reduced by the wholesale purchaser-reseller, again with no reference to any formal termination by DOE, this statement is consistent with the interpretation of § 211.13(f) adopted by the district court and now affirmed by this court.

The district court correctly held that § 211.13(f) required Nelson to use the gasoline it obtained from Shell as a result of upward certification only for the purposes stated in the assignment orders—to supply the allocated gasoline to specific retail outlets—and not to divert the gasoline to other uses. Nelson was further obligated to downward certify to Shell when it no longer needed the allocated gasoline to supply the designated outlets. Under the facts here establishing continuous diversion of

large volumes of gasoline from other assigned outlets to Nelson's own retail outlets and to other uses, the district court correctly found that Nelson had engaged in a willful and blatant violation of § 211.13(f). Nelson was not using the regulations; it was abusing them.

## IV. INJUNCTIVE RELIEF

Nelson does not challenge the correctness of the district court's award of damages, assuming that both jurisdiction and the district court's interpretation of § 211.13(f) are correct. Nelson does, however, challenge the injunctive relief reducing its base period allocation. We hold that the injunctive relief was appropriate in this case.

Nelson first argues that the district court erred in failing to establish a fixed standard, defining both the length of time a jobber must fail to supply DOE assigned accounts and the percentage of allocations not supplied, before the obligation to downward certify accrues. There is no such prerequisite for granting relief here. The regulation stated the standard: when a jobber's needs decline. The facts in this case present a clear violation of that standard. It was unnecessary for the district court or for this court to decide on what lesser presentation injunctive relief would or would not also be available.

The trial record establishes fifteen specific retail outlets for which Nelson had DOE assignment orders but which it did not supply. The district court accordingly reduced Nelson's allocation from Shell by that portion of the annual allocation attributable to the assignment of those stations.[6] This reduction was correct.

Second, Nelson claims that DOE's adoption of a new base period, 44 Fed.Reg. No. 140, 42549 (July 19, 1979), invalidates the injunctive relief. Nelson's argument, were we to accept it, would cause DOE's adoption of a new base period to pardon prior illegal conduct and reward violators of the regulations. We cannot accept such an argument. DOE's adoption of the new base period was made "to reflect market realities," but the changes brought about by Nelson's abusive conduct are not the type of "market reality" that DOE intended to accommodate. The Preamble to DOE's Activation Order No. 1, 44 Fed.Reg. 11,202 (Feb. 28, 1979), which changed the base period, demonstrates that the new base period was established to take into account changes in distribution patterns resulting from normal competitive market forces which had caused the business of certain firms to expand since 1972, while that of other firms had declined. This had resulted in the redistribution of surplus gasoline on a regular basis. Recognition of the fact that wholesaler purchaser-resellers had gasoline which they were redistributing among retail outlets does not support Nelson's position. It merely shows that with respect to customers for whom no upward certification was received, there were changes in demand which the wholesale purchaser-reseller was free to deal with.

The judgment in this case did not involve redistributed surplus. It involved gasoline obtained by Nelson from Shell under false pretenses. The change in the base period was not intended to legitimate and continue this type of change in supply relationships violative of federal law.

The injunctive relief merely acts to take away from Nelson that portion of its allocation that it should have downward certified. Nelson is put in the position it would have been in had it complied with DOE regulations. The judgment enforces DOE allocation regulations and carries out the allocation scheme that the regulations were designed to establish and foster.

## V. RULINGS ON NELSON'S COUNTERCLAIMS

Nelson challenges the district court's dismissal of two of its counterclaims. It also

---

**6.** Although Nelson contends that the district court ordered the allocation reduced by the total amount of gasoline attributable to these assignments and unpurchased over the two and one-half year period, September, 1976 to May, 1979, this contention is incorrect.

challenges the disposition of its third counterclaim. We find no error.

■ Nelson's claim that Shell unlawfully changed Nelson's credit terms in June, 1973 by changing the location to which Nelson was required to deliver credit card invoices was properly dismissed as barred by the applicable three year California statute of limitations. Cal.C.C.P. §§ 340(1), 338(1); *Ashland Oil Co. of Cal. v. Union Oil Co. of Cal.*, Em.App., 1977, 567 F.2d 984. The counterclaim disclosed on its face that the challenged conduct occurred on June 20, 1973, and Nelson's counterclaim was filed on April 20, 1979.

■ Nelson's claim that Shell had violated DOE regulations prohibiting retaliatory action by allegedly filing this action in retaliation for Nelson's state court unfair competition suit did not state a claim on which relief could be granted and was, therefore, properly dismissed. 10 C.F.R. § 201.61 bars only retaliation for exercise of rights under the Emergency Petroleum Act or regulations pursuant to that Act. Because Nelson's state law unfair competition action was not such an exercise of rights, the counterclaim was fatally defective.

■ The district court ruled in favor of Shell after trial on Nelson's counterclaim alleging discrimination in the redistribution of surplus or "underlifted" gasoline during the period April, 1975 through July, 1976. Nelson relies on DOE *Interpretation 1977–41*, 42 Fed.Reg. No. 232, 61273 (December 2, 1977), to challenge this ruling. 10 C.F.R. § 211.10(g)(5) governs the manner in which a supplier may redistribute underlifted gasoline. *Interpretation 1977–41* requires only that this redistribution be non-discriminatory, not that an equal percentage share of the gasoline be given to each customer or group of customers.

During the period to which Nelson's claim relates, Shell redistributed its underlifted gasoline by subclasses—to direct supplied retail customers the amount of underlifted product that was created by that subclass, to wholesale jobbers the amount of underlifted product that was created by that subclass, etc. The district court found that this proportional method of redistribution was not unlawfully discriminatory but instead was fair, proper and rational. We agree.

Affirmed.