SIEGEL OIL COMPANY, a
corporation, Plaintiff,

v.

GULF OIL CORPORATION, a
corporation, Defendant.

Civ. A. No. 78–A–585.

United States District Court,
D. Colorado.

July 23, 1982.

Steven Schaars and Joan L. Goldfrank of Collier, Shannon, Rill & Scott, Washington, D.C., and Jac K. Sperling of Fairfield & Woods, Denver, Colo., for plaintiff.

Charles O. Murray III, Bradley Ford Stuebing and John R. Knight of The Gulf Companies, Houston, Tex., and John A. Bachmann of The Gulf Companies, Denver, Colo., for defendant.

**MEMORANDUM OPINION AND ORDER**

ARRAJ, District Judge.

In this action plaintiff seeks damages for regulatory violations allegedly committed by the defendant during the period of federal control of the allocation of petroleum products. Jurisdiction is conferred pursuant to 15 U.S.C. §§ 751 *et seq.* and 10 C.F.R. §§ 202 *et seq.* A bench trial was held on April 26 and 27, 1982. Less than five days before the commencement of that trial plaintiff filed a motion for summary judgment or, in the alternative, partial summary judgment. The motion is based on defendant's contention that plaintiff's action is barred by the applicable statute of limitations. Because of the late filing of that motion, the procedure provided in Rule 56 could not be strictly followed unless the trial setting were vacated and a later trial date set. That was not requested by either party. At the commencement of the trial, therefore, I informed counsel that the motion would be taken under advisement and considered along with the evidence presented during the trial.

Pretrial and post-trial briefs were filed by the parties. The briefs addressed all issues then remaining, including the motion for summary judgment. After careful consideration of the pertinent evidence and the briefs filed by the parties, I am now persuaded that defendant must prevail through its motion for summary judgment. I shall here give my analysis of the relevant facts and the reasons for this conclusion.

I

The factual background relevant to the pertinent issues is not complex. Plaintiff Siegel Oil Company (Siegel) was supplied with approximately 2.5 million gallons of motor gasoline by Gulf Oil Corporation (Gulf) during January through October 1972. On January 15, 1974, the federal government promulgated the Mandatory Petroleum Allocation Regulations which governed the allocation of petroleum products in the United States.[1] 39 Fed.Reg.

---

1. Federal control of the allocation of petroleum products was discontinued on January 28, 1981. 42 Fed.Reg. 9909 (1981).

1924 (1974) (*codified at* 10 C.F.R. Parts 210 and 211). Under these regulations, a supplier was required to furnish a purchaser during the period of controls with the same volume of gasoline that it had received during the base period year of 1972. See 10 C.F.R. § 211.9(a)(2)(i) (1981). Essentially these regulations attempted to restore the degree of ordered business activity of 1972 in the oil industry to the frenzied business and economic climate present in 1974 and the years thereafter.

Accordingly, Siegel requested in February 1974 that Gulf supply it with the base period volumes of gasoline as required by the regulations. On March 1, 1974, Gulf responded that, in accordance with its obligation, gasoline would be supplied to Siegel through Acorn Petroleum Company (Acorn) and that Siegel should make further arrangements directly with Acorn for purchase and delivery of the gasoline. In this response, Gulf invoked what is commonly referred to as the "substitute supplier rule." Siegel claims that this act, *i.e.* Gulf's failure to supply Siegel directly with gasoline during the period of controls, was a violation of the substitute supplier provision,[2] the normal business practices provision,[3] the antilayering or unnecessary resales provision,[4] and the antidiscrimination provision of the regulations.[5]

On March 8, 1974, Siegel notified Gulf that it would buy gasoline from Acorn under protest. Siegel stated that it considered Gulf's use of Acorn as a substitute supplier to be unfair and unconscionable. Two weeks later Gulf informed Siegel, however, that the matter was non-negotiable and the decision to supply Siegel through Acorn was in accord with Gulf's normal business practices. Acorn did sell to Siegel all the gasoline that it was entitled to under the regulations. In its arrangement with Acorn, Siegel contends, however, it was re-

quired to pay more for its gasoline than it would have had Gulf supplied Siegel directly. In this action, Siegel asks for this price disparity to be refunded to it in the form of damages.

Also on March 8, Siegel submitted an informal complaint to the regional office of the Federal Energy Office (FEO),[6] in which Siegel described the problem it was having with Gulf and requested that the FEO intervene in the matter on behalf of Siegel. The FEO did not process the matter for almost three years. Finally in June 1977, Region III of the Federal Energy Administration (FEA)[7] issued a memorandum which stated that Gulf had not violated the regulations by designating Acorn as Siegel's substitute supplier. The memorandum expressed the informal opinion of the FEA Region III Office and did not constitute final agency action.

Apparently determined to go beyond this level of agency consideration, Siegel filed a formal, briefed complaint with the Department of Energy (DOE) Region VII Office on March 14, 1978. In this complaint, Siegel asked that DOE find Gulf was in violation of the regulations and order Gulf to reimburse Siegel for the increased costs allegedly incurred by reason of Gulf substituting Acorn as the supplier to Siegel. On May 10, DOE formally advised Siegel that it would undertake no further enforcement action with respect to Siegel's complaint since it had reviewed and approved Gulf's use of a substitute supplier in another similar but separate case.

On June 9, 1978, Siegel filed this action against Gulf pursuant to Section 210 of the Economic Stabilization Act of 1970, *as amended,* 12 U.S.C. § 1904 note (1976), and as incorporated into the Emergency Petroleum Allocation Act of 1973 (Allocation Act), 15 U.S.C. §§ 751 *et seq.* (1976). These sections together grant private litigants the

---

**2.** 10 C.F.R. § 211.25 (1981).

**3.** *Id.* § 210.62.

**4.** *Id.* §§ 205.202, 210.62.

**5.** *Id.* § 210.62(b).

**6.** The FEO was a predecessor to the Department of Energy.

**7.** The FEA is the successor to the FEO and predecessor to the Department of Energy.

right to sue for damages caused by the violation of regulations promulgated pursuant to the Allocation Act, including the regulations upon which Siegel bases its claim.

## II

The first issue to be decided is which statute of limitations applies to this cause of action. Defendant claims that Colo.Rev. Stat. § 13–80–106 (1973) is the statute which governs:

> *Actions under federal statutes.* All actions upon a liability created by a federal statute, other than for a forfeiture or penalty for which actions no period of limitations is provided in such statute, shall be commenced within two years or the period specified for comparable actions arising under· Colorado law, whichever is longer, after the cause of action accrues.

Defendant argues that this statute totally bars Siegel's claims or, in the alternative, that Siegel may not recover damages incurred more than two years prior to the filing of this action. Plaintiff responds by asserting that there is no time bar to its complaint since the relevant Colorado limitations statute is the six-year provision which covers "actions of assumpsit, or on the case founded on any contract or liability, express or implied . . . ." Colo.Rev.Stat. § 13–80–110 (1973).

■ The established rule is that, in the absence of a controlling federal statute, a federal court enforcing rights arising under federal statutes will adopt and apply the most analogous limitations law of the state in which it sits. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Because neither the Economic Stabilization Act nor the Allocation Act contains a limitation provision, the Temporary Emergency Court of Appeals has similarly held that section 210 actions will be governed by state statutes of limitation. *Ash-*

*land Oil Co. v. Union Oil Co.,* 567 F.2d 984 (Em.App.1977), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978). Thus, this court must analyze the nature of the claim and then determine which Colorado limitations provision will apply to this case.

■ Despite plaintiff's assertions to the contrary, the nature of this case is quite unambiguous. Simply stated, all of plaintiff's claims are founded upon federal statutes and regulations which create rights unknown to common or state statutory law. And unlike many other jurisdictions, Colorado has a statute of limitation expressly tailored for actions arising from federally created rights. Colo.Rev.Stat. § 13–80–106 specifically provides a two-year limitation period for claims which, like the plaintiff's, arise "upon a liability created by federal statute."

Section 13–80–106 does authorize a longer period for federal statutory claims which are "comparable" to "actions arising under Colorado law." Plaintiff argues that, although this case is based upon federally created rights, its claims may be "compared" to various common and state law actions. The substance of this case and the remedies sought do have a similar flavor in certain aspects to actions of "money had and received" or "wrongful retention or appropriation of money" or even "breach of an implied sales contract." Which of these characterizations is more accurate when compared to this case may be an issue in the absence of the two-year "federal action" limitation. But in this case and as considered within the meaning of § 13–80–106, Colorado law does not authorize a "comparable action", since there is no analogue in Colorado law for the rights the plaintiff seeks to enforce.[8] *Colorado Petroleum Products Co. v. Husky Oil Co.,* 646 F.2d 555 (Em.App.1981). Indeed had Colorado attempted to create such rights its efforts would have been thwarted by federal preemption in the area of gasoline price

---

**8.** See *Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 472 F.Supp. 402, 405 (D.Colo.1979), *aff'd,* 651 F.2d 687 (10th Cir.1981) (action arising under federal securities acts is comparable to

one under Colorado Securities Act; three-year period of limitation applies rather than two year "federal action" limitation).

and allocation control or even by federal constitutional law. At the risk of being repetitive, Congress created in the Allocation Act, and allowed the Department of Energy and its predecessors to define, various rights and liabilities unknown to the common or statutory law of any state and which would not exist in the absence of the federal statute upon which the plaintiff bases its claims.

 Finally plaintiff contends that, at a minimum, a general three-year limitation period should apply since any shorter period would undermine the specific national policy objectives embodied in the Allocation Act. Federal courts will not borrow state limitation periods if their application would contravene the underlying policies of the statute involved. See *Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 367, 97 S.Ct. 2447, 2454, 53 L.Ed.2d 402 (1977). The intent of Congress in enacting the Economic Stabilization Act was to provide a remedial solution for economic problems. Later, in amending this act, it included section 210 with the purpose of allowing private parties to enforce the statute and regulations promulgated pursuant thereto. But in allowing these private enforcement actions, Congress did not specify the length of time in which such an action may be brought. The best that can be inferred from this act is that the period should not be unreasonably restrictive to potential plaintiffs or unreasonably burdensome to defendants. Similarly, plaintiff fails to show how the equitable policies underlying the Allocation Act are unjustifiably thwarted by applying the two-year limitation period. I find and hold that the "federal action" statute of limitation, Colo.Rev.Stat. § 13–80–106, applies to this case and the two-year period provided therein is not unreasonably restrictive.

### III

The second issue to be determined is, given that a two-year limitation period ap-

plies, when did this cause of action accrue and the two years begin to run. Defendant asserts that this action accrued on March 1, 1974, when it appointed Acorn as its substitute supplier. The statute of limitation period had expired, therefore, by the time plaintiff had filed its complaint in this court on June 9, 1978. Plaintiff responds that the regulation violations alleged in its complaint constitute a continuing violation, inasmuch as each month defendant had a new obligation to it and each monthly purchase of gasoline from Acorn violated the regulations to plaintiff's detriment. Each sale, therefore, gave rise to a new cause of action and it can recover for damages incurred within the two-year period before filing and thereafter. Additionally plaintiff alleges that, even if the cause of action accrued in 1974, it could not have brought an action at that time for its damages were speculative and uncertain until each monthly sale was consummated with Acorn.[9]

 Even though a state statute of limitations is applied to a federal claim, the question of when a federal action accrues is to be determined by reference to federal law. *Rawlings v. Ray,* 312 U.S. 96, 61 S.Ct. 473, 85 L.Ed. 605 (1941). Specific treatment as to when an action accrues under the Allocation Act is quite scarce, so each party has drawn analogies to similar circumstances in federal antitrust law. I will do likewise.

### A

 As a general rule, a private cause of action for damages accrues when the plaintiff is first injured in his business affairs by the defendant's acts alleged to be in violation of applicable laws or regulations. *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). An issue inherent in this general rule is when to set the time at which the

---

**9.** No argument has been presented that whenever the limitation period began to run this action was equitably tolled by fraudulent concealment or the like. In a similar vein, it is important to note that an aggrieved party un-

der the Allocation Act need not exhaust available administrative remedies prior to filing a private action for damages. *Bulzan v. Atlantic Richfield Co.,* 620 F.2d 278 (Em.App.1980).

plaintiff's interest was invaded. Note that the focus of this particular issue "must be the nature and extent of defendant's behavior, not the duration of plaintiff's injury." *Baker v. F & F Investment,* 420 F.2d 1191, 1200 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970). I find that the last and only act of the defendant giving rise to this lawsuit was the March 1974 appointment of Acorn as a substitute supplier.

■ Pursuant to 10 C.F.R. § 211.9, a supplier that sold petroleum product during the base period year was required to continue to offer its purchasers the same product throughout the period of controls. More specifically, the defendant herein was to offer plaintiff a certain number of gallons of gasoline during each successive month of controls which corresponded to the base period month. Compare 10 C.F.R. § 211.9 with *id.* § 211.102. Defendant Gulf, however, chose to fulfill its supply obligation through Acorn by invoking the substitute supplier rule. *Id.* § 211.25. Faced with the contention that its complaint is untimely, plaintiff argues that defendant's supply obligation was not suspended by use of the substitute supplier provision. As mentioned earlier, plaintiff claims that each month defendant had a new obligation to supply plaintiff and each month it violated the regulation in not doing so.

I interpret the regulations and case law differently than does the plaintiff. The supply obligations created by the regulations are reflective of the goal of Congress to return to the supplier/purchaser relationships of a more economically stable time. Apparently it was understood by the government that renewing these past relationships may impose some hardship on those parties who had changed their normal business practices in the interim. In order not to disrupt normal business more than necessary, therefore, a regulation was designed to allow a supplier in the base period to arrange with another supplier to fulfill the obligation the regulations had created. The substitute supplier rule thereby allowed a party to sever the original supplier/purchaser relationship by substituting a different supplier without sacrificing the goal of maintaining the same supply obligations that were present during the base period.

In antitrust law, a situation analogous to these circumstances is when a seller refuses to deal with a potential buyer of its commercial product.[10] In that situation, the courts have held that the time of the initial refusal to deal is when the cause of action accrues. Later reaffirmation of the initial rejection, either after continued requests by the buyer or simply by not supplying the buyer when earlier it was customary to do so, is not an additional act by the defendant creating a new cause of action. ˙ *David Orgell, Inc. v. Geary's Stores, Inc.,* 640 F.2d 936 (9th Cir.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981); *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68 (9th Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979).

Similarly by invoking the substitute supplier rule, the defendant "refused to deal" with the plaintiff as its supplier under the federal control regulations. Defendant made it clear that this decision was non-negotiable and, in fact, was not even called upon by the plaintiff to review that decision in the months or years thereafter. And significantly, plaintiff alleges only one legal injury from this decision, i.e., each month it was forced to buy gasoline at a higher price

**10.** Plaintiff cites *Baker v. F & F Investment,* 420 F.2d 1191 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970), in support of its position that defendant in this case has committed a continuing violation. First, the specific facts in *Baker* are not directly analogous to allow favorable comparison of its holding to the circumstances of this case. *Bak-*

*er* involved various consumer transactions in which racial discrimination was alleged, as opposed to the relationship of seller and buyer of a commercial product. Secondly, an "ongoing relationship" between the parties was present in *Baker* as the sellers enforced the contracts by collecting rent. In this case, the absence of

than if supplied by defendant.[11] "If the violation alleged as the basis for the cause of action inflicts only one legal injury, a single cause of action accrues at the time of the injury and the statute of limitations begins to run at that time .... The [limitation] period commences at the time of the act causing *injury* to the plaintiff's business or property, even though the *damages* resulting therefrom may continue beyond that time." 13 J. Von Kalinowski, Antitrust Laws and Trade Regulation § 103.-02[1][a] (1981).

These conclusions are supported by the case of *Shell Oil Co. v. Nelson Oil Co.,* 627 F.2d 228 (Em.App.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980). In that case, defendant filed a counterclaim in April 1979 and alleged that plaintiff had altered its practice of accepting credit card receipts each month for immediate cash credit at a local delivery terminal. Instead, plaintiff required that beginning June 30, 1973, the receipts be mailed to its offices out of state for credit processing. As a defense to the counterclaim, plaintiff alleged that the three-year statute of limitations had expired. Similar to the argument in this case, defendant in *Shell* responded that the refusal to no longer accept credit card receipts for immediate credit was a continuing violation of applicable regulations in that each month a new action accrued. Although treatment of the issue was cursory, the appellate court rejected the continuing violation concept under the DOE regulations and held that the last injurious act of the defendant was the initial change in 1973 refusing to allow cash credit for the receipts and therefore the counterclaim was barred. 627 F.2d at 236.

Thus the two-year statute of limitations will begin to run from the time when the plaintiff first incurs legal damage from defendant's decision to use a substitute supplier. That time is either March 1974, when the defendant communicated its decision to

plaintiff, or May 1974, when the plaintiff first bought gasoline from Acorn at an alleged high price. At either time, the two-year limitations period had expired long before plaintiff filed this action in June 1978.

**B**

■ Plaintiff finally contends that, had it brought suit in March 1974 when the defendant made known its intention to use Acorn as a substitute supplier, calculating plaintiff's future damages would have been speculative and unprovable. Such a denial of an effective remedy prompted the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) to carve an exception from the statute of limitations bar in federal antitrust law for situations where damages caused by the wrongful act do not appear until later. The Court declared that although a cause of action accrues from the date of defendant's act for past and reasonably ascertainable future damages, separate causes of action may accrue in the future for damages too speculative to have been awarded earlier. These later causes of action accrue as their impact is felt by the plaintiff. 401 U.S. at 339, 91 S.Ct. at 806.

*Zenith* did not focus on the criteria for determining whether damages are too speculative to permit recovery. The principal cases helpful in that regard are *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946) and *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). These cases teach that when a defendant's wrong has been proven, the factfinder "may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.'" *Bigelow,* 327 U.S. at 264, 66 S.Ct. at 579.

an ongoing relationship is a critical factor and the basis of many of plaintiff's claims.

**11.** For example, if plaintiff was forced to close its business because of defendant's refusal to supply it with gasoline, a new cause of action

would have accrued as of the date of plaintiff's closure since this injury is additional and separate from buying gasoline at a high price. See *Continental-Wirt Electronics Corp. v. Lancaster Glass Corp.,* 459 F.2d 768 (3d Cir.1972).

Under reciprocal analysis, focus can be shifted to determining when damages may be "reasonably ascertainable" in order for the limitation period to run. Of course, reasonably ascertainable does not mean provable with clear and convincing certainty. Reasonably ascertainable damages do include future damages when it is foreseeable when they will accrue and even the general rate at which they will accrue. When such future damages are foreseeable at the time of the act and could have been recovered or at least stopped by injunction in a lawsuit commenced at that time (or within two years thereafter), then *Zenith* implies no new action accrues.

In this case, certainly after the first month's purchase of gasoline from Acorn, plaintiff could foresee that each month it would be damaged and each month the rate of damages would be the difference between the price Acorn paid to the defendant and the price plaintiff paid to Acorn. That the specific dollar amount is not determinable until each monthly sale does not render plaintiff's claim for regulation violations too vague or speculative to toll the limitations period.[12] If this case was filed in 1974, plaintiff could have received damages actually incurred up to the end of trial and an injunction against further damaging acts in the future. I find that plaintiff's damages could have been sufficiently ascertained in March 1974 or at least by May 1974 when plaintiff apparently made its first purchase from Acorn. Plaintiff's action based upon violation of DOE regulations arising out of defendant's appointment of a substitute supplier is barred by the statute of limitations. Accordingly, it is

ORDERED that the complaint and claims of the plaintiff Siegel Oil Company should be, and the same hereby are, dismissed. Each party shall bear its own costs.

---

12. It is clear that such damages are more easily ascertainable and much less speculative than, for example, the loss of a potential market or future profits, as was the situation in *Zenith*.