OASIS PETROLEUM CORPORATION,
Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF
ENERGY, et al., Defendants and
Defendant-Appellant.

No. 5–91.

Temporary Emergency Court of Appeals.

Argued April 14, 1983.

Decided Sept. 8, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 11, 1983.

David G. Wilson, Bracewell & Patterson, Washington, D.C., with whom Gerard R. McConnell, Washington, D.C., of the same firm, on the brief for Research Fuels, Inc., defendant-appellant.

Katherine L. Henry, Dept. of Energy, Washington, D.C., with whom David A. Engels of the same agency, on the brief for U.S. Dept. of Energy, defendant.

Mark N. Savit, Cotten, Day & Doyle, Washington, D.C., with whom Bruce A. McDonald and G. Lindsay Simmons, Washington, D.C., of the same firm; and George E. Bowles, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., with whom Larry M. Lesh, Dallas, Tex., of the same firm, on the brief for Oasis Petroleum Corp., plaintiff-appellee.

Before INGRAHAM, GARZA and THORNBERRY, Judges.

THORNBERRY, Judge:

INTRODUCTION:

Research Fuels, Inc. appeals the district court's grant of summary judgment to Oasis Petroleum Corp. in this dispute over the right to the proceeds of the sale of 3,000,000 gallons of gasoline. Concluding that the court should first have referred this entire matter to the Office of Hearings and Appeals [OHA] of the Department of Energy [DOE] under the doctrine of primary jurisdiction, we REVERSE and REMAND.

FACTS AND PROCEDURAL HISTORY:

As of July 1978, defendant-appellant Research Fuels Inc. [RFI], an independent gasoline marketer, sold gasoline through approximately 220 retail outlets, including 84 retail outlets comprising Remex, a wholly-owned RFI subsidiary. RFI also sold gasoline to approximately 36 wholesale customers. RFI and Remex received the allocation entitlements necessary to supply their retail outlets from Marathon Oil Co. [Marathon] and Cities Service Co. [Cities]. These entitlements were predicated upon the base year 1972, meaning that RFI and Remex were entitled to receive from Marathon and Cities those monthly quantities of gasoline established by the historical chain of supply for the year 1972.

By September 1978, RFI was in dire financial straits, due in part to a number of unprofitable acquisitions. The company's independent auditors informed the management that an unfavorable audit opinion would be issued in the absence of an immediate infusion of capital. The company had also fallen behind in payments to its three principal gasoline suppliers, which included Marathon and Cities. Marathon and Cities suspended all sales of gasoline to RFI and demanded immediate payment of all outstanding debts before resuming deliveries.

In September 1978 RFI entered into negotiations with plaintiff-appellee Oasis Petroleum Corp. [Oasis] for the sale of 84 of RFI's retail outlets. These outlets included 82 Remex outlets, and 2 RFI-owned outlets. By an agreement dated September 27, 1978, Oasis agreed to purchase the 84 outlets for a total consideration of $1.8 million. This asset purchase agreement further provided that, in addition to the retail outlets, the assets purchased by Oasis included all of RFI's rights to, and allocation of, gasoline supplies for the retail outlets, and all of RFI's right, title and interest in and under the supply contracts with Marathon and Cities.

Following the execution of this agreement, Oasis withdrew from the agreement because of inadequate assurances from Cities and Marathon regarding the assignment of gasoline formerly delivered to RFI. Further negotiations were undertaken, culminating in an agreement providing that Oasis would receive RFI's entire supply of gasoline from Cities and Marathon. The asset purchase agreement was modified accordingly on October 24, 1978. The amended asset purchase agreement also reduced the consideration paid by Oasis by $250,-000.00. In order to reflect the agreements of all the parties, the following agreements were executed along with the amendment to the asset purchase agreement:

(1) a substitute supplier agreement among RFI, Oasis and Marathon, transferring to Oasis RFI's gasoline entitlement from Marathon. RFI certified in this agreement that its adjusted base period supply obligation to the 84 outlets equalled 100% of Marathon's adjusted base period supply obligation to RFI. All of the parties agreed to cooperate in obtaining DOE approval of this agreement.

(2) a three-party agreement among RFI, Oasis and Cities, transferring to Oasis RFI's entire base period allocation of gasoline from Cities. Under this agreement, Cities was to supply Oasis on a temporary basis, and on a permanent basis if ordered by the DOE.

(3) a number of other agreements not relevant to our disposition of this case, including a distribution agreement between Cities and Oasis, an acknowledgment of transfer of title and management control from RFI to Oasis, a mutual cancellation and release between Marathon and RFI, and a similar cancellation and release between Cities and RFI.

By letter dated September 20, 1978, RFI advised all wholesale purchasers that it would discontinue all wholesale activities effective September 25, 1978.

On November 8, 1978, the three-party agreement between Oasis, RFI and Cities was submitted to the Economic Regulatory Administration [ERA] of the DOE. The ERA responded by issuing instructions for obtaining a change in suppliers, and requested a separate set of documentation for each of the 84 retail outlets sold to Oasis. On December 18, 1978, Cities sent ERA a letter in which the annual adjusted base period volumes differed from those submitted in the November 8, 1978 letter. These volumes were broken down by region, instead of by retail outlet as requested by the ERA. The DOE has never approved any of the 1978 or 1979 agreements executed among Oasis, Marathon, Cities and RFI.

On February 22, 1979, DOE issued Stand-by Regulation Activation Order No. 1, 44 Fed.Reg. 11202 [Order No. 1], which changed the base period for the allocation of gasoline from calendar 1972 [old base period] to the year beginning July 1, 1977 and ending June 30, 1978 [new base period].

Between October 1978 when the agreements were signed, and March 1, 1979, the

effective date of Order No. 1, Oasis received from Cities and Marathon 100% of the volumes of gasoline set out in the October 1978 agreements.

However, RFI did not discontinue its wholesale business as of the new, effective base year, but sold some of its allocation from Marathon and Cities to wholesale customers between July 1, 1977 and June 30, 1978. As a result, the 84 retail outlets that Oasis had purchased from RFI failed to receive their full supply of gasoline in the chain of supply from Marathon and Cities. As a result of their purchases from RFI during the new base year, the wholesalers became entitled to allocations based upon their purchases. This created the central issue in this lawsuit. RFI contended that it was entitled to receive a portion of the Marathon and Cities supply previously going to Oasis, in order to meet its obligations to wholesale purchasers under the new base year. Oasis, on the other hand, contended that it was the proper supplier to RFI's wholesale purchasers.

Shortly after the effective date of Order No. 1, Oasis and RFI became embroiled in a lawsuit similar to this one in the 17th Judicial District Court of Tarrant County, Texas. On April 12, 1979, the parties executed a settlement agreement that was subsequently incorporated into a judgment entered by the state court. The settlement agreement provided that Oasis would receive all gasoline that either Oasis or RFI were entitled to receive from Cities and Marathon pursuant to the supply contracts or the DOE allocation regulations, regardless of changes in supply, market conditions, or base period regulations. In addition, Oasis was obligated to sell to RFI at net cost three million gallons of gasoline per month which it received from Cities and Marathon, conditioned upon RFI's maintaining all supply obligations to its former wholesale customers. RFI filed for bankruptcy in June 1979.

In June and July of 1979, Oasis filed a complaint in federal court seeking declaratory and injunctive relief against DOE,

RFI, Cities, and Marathon. The complaint contained three counts. Count One sought to enjoin the DOE, Marathon and Cities from taking any action inconsistent with Oasis' right to purchase gasoline from Marathon and Cities under the amended asset purchase agreement. Count Two sought affirmative relief against RFI for breach of the amended asset purchase agreement.[1]

On August 3, 1979, the district court granted Oasis' motion for a preliminary injunction and granted the following preliminary relief:

(1) an injunction prohibiting DOE from issuing administrative transfer orders diverting the disputed gasoline from Marathon and Cities to RFI, instead of supplying it to Oasis;

(2) an injunction ordering Marathon and Cities to continue supplying Oasis with gasoline under the amended asset purchase agreement;

(3) an order directing Oasis to escrow all profits from its sales of the disputed gasoline;

(4) an order directing Oasis to submit monthly accounting reports on the sales of the disputed gasoline.

The escrowed profits are currently deposited in the registry of the district court.

In August 1979, Oasis claimed a breach of the settlement agreement approved by the Texas state court, and refused to supply RFI with gasoline under that agreement.

In November of 1979 and January of 1980 RFI sought to enforce the settlement agreement in district court. Noting that the terms of this agreement had not been reviewed by the DOE, the court refused to enforce it, opting instead to remand it to the Office of Hearings and Appeals [OHA] of DOE for administrative review. Seeking only a discrete administrative ruling on the efficacy of the terms of the settlement agreement, the district court claims that it was somewhat surprised on April 11, 1980, to receive a "comprehensive analysis of the rights and liabilities of the parties" from

---

1. A third count, against Lucky Stores, Inc., based upon alleged unlawful interference with

Oasis' rights under the amended asset purchase agreement, was dismissed in September 1979.

the OHA. This comprehensive analysis devoted little attention to the settlement agreement, focusing instead upon the regulatory rights and obligations of the parties arising out of the original amended asset purchase agreement. OHA concluded that RFI was entitled to the disputed gasoline that it had sold to wholesale purchasers during the new base period, and that Oasis was entitled only to what it had received from Marathon and Cities for its newly-acquired 84 retail outlets during the new base period. The OHA found the settlement agreement unenforceable, characterizing it as a private contract which in the absence of DOE approval could not permanently alter the regulatory rights and obligations of the parties.

DOE and RFI then moved that the district court accept OHA's findings *in toto* on the ground that they were supported by substantial evidence. Oasis moved that the district court strike or ignore OHA's findings. The district court stayed its decision pending trial on the merits.

On January 28, 1981, the President issued Executive Proclamation No. 12,287, 3 C.F.R. 124 (1982), *reprinted in* 15 U.S.C. § 757 note (Supp. V 1981) [the Proclamation], exempting all crude oil and refined petroleum products, including gasoline, from the allocation controls generated by the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 *et seq.* (1976) (partially superseded) [EPA]. Oasis and the DOE then claimed that, since the DOE was no longer empowered to enforce the allocation regulations, Oasis' declaratory and injunctive claims against the DOE in Count One of its complaint were moot. The district court agreed. Since all of the parties were in agreement that, with the advent of deregulation, there was no relief that could issue against Marathon, the district court dismissed the claims against Marathon as moot. Since Cities stood on the same footing as Marathon, the claims against Cities were dismissed as well. This left only the disagreement between Oasis and RFI over the escrowed funds arising out of the sale of the disputed gasoline. Both parties moved for summary judgment on this issue. The district court's findings and conclusions are set forth below:

(1) OHA's determination that the settlement agreement was void was supported by substantial evidence, and was neither arbitrary nor capricious.

(2) Since OHA was not directed by the district court to address any issues other than the validity of the settlement agreement, all of OHA's other findings and conclusions were purely advisory.

(3) DOE lacked authority to disapprove the amended asset purchase agreement. DOE had a presumption favoring approval of such agreements. The agreement was therefore entitled to *de facto* approval, and was valid.

(4) DOE lacked authority to retroactively apply the order changing the base year so as to invalidate the rights and obligations of the parties under the amended asset purchase agreement.

(5) Alternatively, DOE approval of the amended asset purchase agreement was not required for it to be valid.

(6) In the absence of any genuine issue of material fact, Oasis was entitled to the escrowed funds, under the amended asset purchase agreement. The court granted Oasis' motion for summary judgment.

On appeal, RFI claims that the district court erred in refusing to review as one final order all parts of OHA's comprehensive analysis, that OHA had authority to disapprove the amended asset purchase agreement, and that OHA had authority to apply the order changing the base period so as to invalidate the amended asset purchase agreement. RFI further claims that the court should have referred the entire dispute to OHA under the doctrine of primary jurisdiction.

ANALYSIS:

*Primary Jurisdiction*

The Supreme Court of the United States has defined the doctrine of primary jurisdiction as

    ... a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of

administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *accord Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973); *United States v. Western Pacific R.R.,* 352 U.S. 59, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Western Pacific,* 77 S.Ct. at 165; *see Port of Boston Marine Terminal Association v. Rederiaktiabolaget Transatlantic,* 400 U.S. 62, 91 S.Ct. 203, 208, 27 L.Ed.2d 203 (1970) (coordination between traditional judicial machinery and agencies is necessary if consistent and coherent policy is to emerge); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 1215, 25 L.Ed.2d 442 (1970) (whenever possible, district courts should obtain the views of the relevant agency where it has not set forth its views).

"Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Western Pacific,* 77 S.Ct. at 165, citing *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940). Where the doctrine is applied, the court's jurisdiction "is not thereby ousted, but only postponed." *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963). *See Shell Oil Co. v. Nelson Oil Co.,* 627 F.2d 228, 232 (Em.App.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980) (doctrine of primary jurisdiction does not determine whether the court will ultimately decide an issue, but only whether court will postpone such a decision to allow administrative agency to make the initial decision). Professor Davis has stated that the principal reason for the doctrine is

... recognition of the need for orderly and sensible coordination of the work of [administrative] agencies and of courts. Whether the agency happens to be expert or not, a court should not act upon [a] subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer, for otherwise the parties who are subject to the agency's continuous regulation may become the victims of uncoordinated and conflicting requirements.

3 Davis, Administrative Law Treatise 3, § 1901.

Although the doctrine originally developed in actions arising under the Interstate Commerce Act, 49 U.S.C. §§ 1, *et seq., see American Trucking Associations v. I.C.C.,* 682 F.2d 487, 491 (5th Cir.1982), it has been expanded to include nearly every case in which a matter brought before a federal court happens to lie within the special competence of some administrative body. In particular, the doctrine has been applied in actions which arise under the EPAA and the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (1976) (as amended) [ESA]. *See, e.g., Terrell Oil Corp. v. Atlantic Richfield Co.,* 468 F.Supp. 860, 865 (E.D. Tenn.1978) (complex legal and factual matters requiring construction of EPAA should first be referred to agency in order to obtain benefit of its expertise); *Orange & Rockland Utilities, Inc. v. Howard Oil Co.,* 416 F.Supp. 460, 465–66 (S.D.N.Y.1976) (ac-

tion commenced before agency involving complex agency regulations was properly referred to the agency under the doctrine of primary jurisdiction); *Eastern Air Lines, Inc. v. Mobil Oil Corp.*, 403 F.Supp. 757, 759 (S.D.Fla.1975) (complex and technical determinations regarding crude oil prices were best referred to agency with expertise in the area). In *Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278, 283 & n. 5 (Em.App.1980), this Court recognized that issues arising under the ESA and the EPA should under the proper circumstances first be referred to the FEA or DOE under the doctrine of primary jurisdiction. Where complex issues involving agency authority and regulations are present, the circuit courts have also frequently recommended that a district court first obtain the benefit of an agency's expertise before undertaking to resolve the issues on its own.[2]

■ No fixed formula exists for determining when the doctrine of primary jurisdiction should be applied. *Western Pacific,*

77 S.Ct. at 165; *Bradford School Bus Transit, Inc. v. Chicago Transit Authority*, 537 F.2d 943, 949 (7th Cir.1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). However, the courts have customarily considered four factors in determining whether to defer initially to administrative review of a matter under the doctrine of primary jurisdiction. These are: (1) whether the question at issue is within the conventional experience of judges;[3] (2) whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise;[4] (3) whether there exists a danger of inconsistent rulings;[5] and (4) whether a prior application to the agency has been made.[6]

■ RFI claims that the dispute in this case does not fall within the conventional expertise of judges, but requires the interpretation and application of complex allocation regulations as they affect the conflicting claims of RFI, Oasis, Cities, Marathon, over thirty wholesale customers, and over

2. *See, e.g., American Trucking Associations v. I.C.C.*, 682 F.2d 487 (5th Cir.1982), in which the Fifth Circuit stated:

> When faced with two roads diverging, one leading through the unmarked forest of judicial guesswork and one leading through the clearing of agency expertise, this Court has preferred to take the less traveled by, that of primary jurisdiction. Although primary jurisdiction provides a temporary refuge from a difficult decision, we carefully examine the question presented to us to determine whether the rationale underlying primary jurisdiction applies and whether further determination by the agency will illuminate those issues before us. "What bears continual emphasis is that the Court neither passes off final decision on to another tribunal nor escapes from its ultimate duty to decide. For after the exercise of primary jurisdiction determination by the agency concerned, the case comes back in a suitable way for the Court, as a Court, to act."

*Id.* at 492, citing *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 241 (5th Cir.1976).

3. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Far Eastern Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 493, 96 L.Ed. 576 (1952); *Orange & Rockland Utilities, Inc. v. Howard Oil Co.*, 416 F.Supp. 460, 466 (S.D.N.Y.1976); *Society of New York Hospital v. Associated Hospital Service of New York*, 367 F.Supp. 149, 154 (S.D.N.Y.1973).

4. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *New Mexico Association for Retarded Citizens v. State of New Mexico*, 678 F.2d 847, 850 (10th Cir.1982); *Kappelmann v. Delta Air Lines*, 539 F.2d 165, 169 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *Orange & Rockland Utilities, Inc. v. Howard Oil Co.*, 416 F.Supp. 460, 466 (S.D.N.Y.1976).

5. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Great Northern RR v. Merchant's Elevator Co.*, 259 U.S. 285, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *Transway Corp. v. Hawaiian Express Service*, 679 F.2d 1328, 1332 (9th Cir.1982); *Kappelmann v. Delta Air Lines*, 539 F.2d 165, 169 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 496 F.2d 214, 223 (3rd Cir.1974); *Orange & Rockland Utilities, Inc. v. Howard Oil Co.*, 416 F.Supp. 460, 466 (S.D.N.Y.1976).

6. *American Trucking Associations, Inc. v. I.C.C.*, 682 F.2d 487, 492 (5th Cir.1982); *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 496 F.2d 214, 223 (3rd Cir.1974); *Orange & Rockland Utilities, Inc. v. Howard Oil Co.*, 416 F.Supp. 460, 466 (S.D.N.Y.1976).

one hundred retail outlets. Oasis counters with the claim that the questions raised are straightforward and purely legal, and that initial referral of the entire matter to DOE would have served no purpose. *Board of Education of City School District of City of New York v. Harris,* 622 F.2d 599, 607 (2d Cir.1979), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). Our analysis of the issues presented to the district court reveals that they are far from simple, and would benefit greatly from initial treatment by the agency.

The district court found that DOE lacked authority to "retroactively" apply Order No. 1 to invalidate the amended asset purchase agreement, reasoning that application of the order worked to defeat the expectations of all parties to the agreement. We are not persuaded that this complex question may be disposed of solely through the straightforward application of basic principles of contract law.[7] Order No. 1 does not appear to affect events occurring before it was issued; rather, it changes the applicable base period for transactions occurring after it came into effect. On June 20, 1978, before the parties entered into the amended asset purchase agreement, DOE proposed special rules granting ERA authority to update the base period, thereby putting the parties on notice that the 1972 base period referred to in their planned agreement could be changed. The question of their intent is therefore not quite as simple as the district court makes it out to be.

Furthermore, in *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975), this Court upheld the constitutionality of FEA supplier-purchaser rules superseding a contractual agreement entered into twenty-five years before the enactment of the EPAA, stating that "reasonable and practical regulations which are generally fair and equitable, although not necessarily so as applied to a particular person, are not unconstitutional when general regulations are necessary to accomplish an appropriate congressional purpose." *Id.* at 361. Similarly, in *Basin, Inc. v. FEA,* 534 F.2d 324 (Em.App.1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977), we held that "sales made after the Allocation Act of September 29, 1975, are not beyond the reach of that legislation merely because they occur in performance of agreements entered into before September 29." *Id.* at 326. These decisions indicate that the parties' intent may not be controlling where it conflicts with lawfully issued regulations. In our case, therefore, the intent of the parties to the amended asset purchase agreement should also be given effect within the context of the applicable allocation regulations and Order No. 1. This the district court did not do. The question here is essentially one of policy and authority, and DOE should be given the opportunity to explain and apply its policy and regulations before the district court considers the merits of these conflicting claims.

■ We are also troubled by the district court's *de facto* approval of the amended asset purchase agreement solely on the ground that DOE policy included a "presumption" that agreements of this sort would be approved. A presumption is not a rule. Congress has entrusted DOE with the task of approving or disapproving these agreements. Surely, this matter lies within the special area of the agency's expertise and discretion. OHA is best equipped to initially evaluate DOE's exercise of its discretion in this matter. In its memorandum order the district court failed to consider a number of reasons advanced by RFI to explain the agency's failure to approve the agreement, reasons which may well have persuaded the agency that the agreement did not merit its approval.[8]

■ Nor are we persuaded that RFI's lack of wholesale activity after October

---

7. The district court's somewhat abbreviated analysis of this complex question is representative of its memorandum order as a whole. Comparison of the court's five and one-half pages of conclusions with OHA's comprehensive, detailed thirty-page analysis of the issues

bears out our conclusion that this was a matter ripe for initial determination by the agency.

8. First, twelve days after Cities submitted the agreement to DOE for approval, RFI notified DOE and Cities that it did not consent to the

1978 necessarily constituted an actual abandonment of that activity, particularly in light of RFI's expressed intent to resume this business when circumstances permitted. FEO Ruling 1974–3 [CCH] Eng.Mgmt. # 16,013 (Feb. 1, 1974) provides that "a purchaser does not lose his right to an allocation from his base period supplier unless, during the base period, the purchaser abandons his ongoing business entirely or transfers this entire ongoing business to a third party ... even though (1) the supplier ceased supplying the producer since the base period." The question of RFI's abandonment of its wholesale business should be addressed in the context of relevant DOE regulations and rulings. Once the district court has received the benefit of the agency's expertise, it is free to reach its own conclusions under the proper standard.

■ In further support of our conclusion that the doctrine of primary jurisdiction should have been invoked by the district court, we note that prior applications to the agency had already been made in this matter by several of the parties. DOE was also required to cope with the ramifications of the district court's injunction in ruling upon the applications of wholesale purchasers from RFI denied access to Marathon and Cities' supplies, creating a clear danger of inconsistent rulings. *See Quigley v. Exxon Co.,* 376 F.Supp. 342, 355 (M.D.Pa.1974). All of the factors customarily considered in determining whether the doctrine of primary jurisdiction applies are present in this case.

■ This is not a case like *Shell Oil Co. v. Nelson Oil Co.,* 627 F.2d 228 (Em.App.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980), where we held that "the doctrine of primary jurisdiction does not apply where the only task facing the dis-

trict court is 'to determine the meaning of words ... which were used in their ordinary sense and to apply that meaning to the undisputed facts.'" *Id.,* at 232, citing *Great Northern RR v. Merchant's Elevator Co.,* 259 U.S. 285, 42 S.Ct. 477, 480, 66 L.Ed. 943 (1922). *See also Transway Corp. v. Hawaiian Express Service,* 679 F.2d 1328, 1332 (9th Cir.1982) (where district court had only to mechanically apply a general rule to the facts, absence of any need for administrative expertise precluded referral of matter to agency under doctrine of primary jurisdiction). The facts in this case are exceedingly complex, and the resolution of the legal issues presented requires reference to a web of complex regulations and shifting policies most familiar to those initially responsible for their implementation and review. The district court submitted only the narrow question of the validity of the settlement agreement to OHA. This agreement, however, was not reached in a vacuum. It was the result of the attempted implementation of the amended asset purchase agreement never approved by DOE, the intervention of Order No. 1 altering the applicable base period, RFI's unforeseen sales to wholesale producers, and a lawsuit in state court between the parties. The picture was further complicated by the President's proclamation deregulating crude oil and refined petroleum products. We fail to see how OHA could have decided the narrow question submitted to it by the district court without simultaneously considering all these related matters. OHA did in fact attempt to offer its views on a number of issues inextricably bound up with the one question submitted to it; the district court, however, refused to even consider the unsolicited conclusions reached by the agency, branding them as "blatantly in excess of [OHA's] authority."[9]

termination of entitlements for any outlets other than the 84 sold Oasis. Second, applicable regulations required that identifiable, affected wholesale purchasers be notified of the proposed agreement before it could be approved. There is no evidence that this was done. Third, Cities submitted the agreement to DOE accompanied by improperly formatted data.

**9.** *United States v. Zweifel,* 508 F.2d 1150, 1156 (10th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct.

47, 46 L.Ed.2d 46 (1975) (a court should not act upon a subject matter that is peculiarly within the agency's specialized competence without taking into account what the agency has to offer). Because the scope of OHA's inquiry was severely limited by the district court's order, we are not able to treat any but the one explicit finding as a genuine finding or conclusion reviewable under the arbitrary and capricious standard, and must therefore remand to

The district court characterized this case as "a law professor's dream and a judge's nightmare." We agree. At the same time, we feel that the more nightmarish aspects of this matter might be dissipated under the informed light of agency review. Agency review of the issues presented can provide a basis for rational decision when the district court, and perhaps this Court, again review this matter. *American Trucking*, 682 F.2d at 492.

The district court should have first entrusted this entire matter to the agency under the doctrine of primary jurisdiction. Its failure to do so amounted to an abuse of discretion. *See Columbia Gas Transmission v. Allied Chemical Corp.*, 652 F.2d 503, 519 n. 14 (5th Cir.1981); *Harris*, 622 F.2d at 606. Accordingly, we REVERSE and REMAND for proceedings not inconsistent with this opinion.

We stress, however, that our analysis of the issues in this case is in no way to be construed as an expression of opinion on how the merits of the case should ultimately be resolved. In considering whether this matter should first have been referred to the agency, we have had to consider arguments not addressed by the district court in its memorandum order. This does not mean that we adopt or approve any of these arguments. Our analysis is designed solely to resolve the question of primary jurisdiction, and should be accorded no additional significance upon remand.

permit OHA to conduct its proceedings unfettered by judicially imposed constraints, in accordance with its normal procedures.