**RESEARCH FUELS, INC.,**
Plaintiff–Appellant,

v.

**UNITED STATES DEPARTMENT OF ENERGY and George B. Breznay, as Director of the Office of Hearings and Appeals, Defendants–Appellees.**

No. 5–133.

Temporary Emergency Court of Appeals.

Argued May 18, 1992.

Decided Aug. 27, 1992.

. As Amended Nov. 6, 1992.

David G. Wilson, Andrews & Kurth, Washington, D.C., for plaintiff-appellant Research Fuels, Inc.

Don W. Crockett, U.S. Dept. of Energy, Washington, D.C., with whom Thomas W. Sacco, of the same office was on the brief, for defendants-appellees U.S. Dept. of Energy, et al.

Before GARZA, Chief Judge, and DAUGHERTY and BROWN, JJ.

WESLEY E. BROWN, Judge.

Appellant Research Fuels, Inc. ("RFI"), appeals the district court's ruling granting summary judgment in favor of the United States Department of Energy ("DOE"). The dispute concerns a claim filed by RFI in a special refund proceeding administered by the Office of Hearings and Appeals ("OHA") of the Department of Energy. The OHA denied the claim, finding that RFI had not demonstrated that it was entitled to recover out of a special fund set up to compensate victims of regulatory violations committed by Marathon Petroleum Company. RFI appealed OHA's ruling to the U.S. District Court for the Northern District of Texas. The district court upheld the OHA determination on the grounds that it was supported by a rational basis. RFI asks this court to reverse the OHA determination and to remand the case to the agency. We agree with the district court that the OHA's determination was supported by a rational basis and we therefore affirm the judgment.

## I. *The Consent Order.*

On January 30, 1986, Marathon Petroleum Company ("Marathon") entered into a consent order with DOE. The consent order settled DOE's allegations that Marathon had violated the Mandatory Petroleum Price and Allocation Regulations during the period of regulation. Without admitting wrongdoing, Marathon paid over $12,-649,522 to DOE for distribution to parties injured by Marathon's alleged regulatory violations. The OHA then instituted special refund proceedings in accordance with 10 C.F.R. Part 205, Subpart V, to distribute the funds.

RFI filed an application for a refund in the Marathon proceeding. The application alleged that Marathon, which had been a supplier of RFI's, unlawfully withheld 28.8 million gallons of gasoline from RFI during the period March 1, 1979 to January 27, 1981. RFI sought a total refund of $1,078,-305 from the fund, asserting that Mara-

thon's failure to deliver the gasoline caused RFI to lose that amount in profits.

OHA rendered a final decision denying RFI's claim on October 21, 1989. *See Marathon Petroleum Co.*, 19 DOE ¶ 85,575 (1989). The OHA decision noted that under the standard governing claims such as RFI's, RFI did not have the burden of proving that alleged regulatory violations had actually occurred. Rather, RFI had to show that its claim was "non-spurious" and that RFI had reacted contemporaneously to protect its interest.[1] OHA nevertheless concluded that RFI had failed to show that its claim was "non-spurious." The basis for this conclusion was a determination by OHA that Marathon would have had valid defenses against any action brought against it founded on the allocation violations alleged by RFI. RFI contends that this conclusion was erroneous and that it must be reversed. In order to address RFI's argument, we first examine the history of Marathon's relationship with RFI.

## II. *Procedural History.*

RFI was a nonbranded independent marketer of gasoline throughout the period of regulation. RFI sold gasoline through approximately 220 retail outlets as of July 1978. It also sold gasoline to about 36 wholesale customers. Marathon Oil Company was one of RFI's major suppliers. Under the allocation regulations then in effect, RFI was entitled to receive certain quantities of gasoline from Marathon. The size of this entitlement was determined by reference to quantities supplied to RFI in the year 1972.

By September of 1978, RFI was in dire financial straits, due in part to a number of unprofitable acquisitions. In addition, the firm was heavily indebted to its three major suppliers—Marathon, Cities Service and Champlin. In September of 1978, Marathon and Cities suspended sales of gasoline to RFI and demanded immediate payment of outstanding debts before resuming delivery. In order to raise needed capital, RFI entered into negotiations with Oasis Petroleum Corp. ("Oasis") regarding the sale of 84 of RFI's retail outlets. By an agreement dated September 27, 1978, Oasis agreed to purchase the 84 outlets for $1.8 million. The agreement also provided that Oasis would acquire all of RFI's allocation of gasoline for the retail outlets. Oasis withdrew from the agreement shortly after its execution, however, because of inadequate assurances from Marathon and Cities regarding the assignment of gasoline formerly delivered to RFI. Further negotiations were then undertaken, culminating in an amendment to the asset purchase agreement on October 24, 1978. The amendment reduced the amount of consideration paid by Oasis. At the same time, a "Substitute Supplier Agreement" was executed which purported to terminate the supplier/purchaser relationship between Marathon and RFI and to establish the same relationship between Marathon and Oasis. Also on October 24, 1978, RFI signed a promissory note of just over $3 million payable jointly to Marathon, Cities and Champlin. The note was payable in $50,000 monthly installments. Marathon's share of this indebtedness was about $1 million. These agreements provided that they had to be approved by the DOE. The agreements were submitted to DOE but were never approved.

From November 1978 through January of 1979, RFI made payments on its note in a timely manner. RFI failed to make timely payment of installments due on February 1 and March 1, 1979. RFI did not become current on its note payments until March 22, 1979. Also about this time, RFI asserted in correspondence to Cities that Cities remained the base supplier on certain RFI retail outlets that were not sold to Oasis. RFI stated that the agreement purporting to transfer RFI's gasoline allocation to Oasis had inadvertently included 9.8 million gallons of gasoline attributable to retail stores not sold to Oasis. Just as this dispute began to emerge, a change in DOE regulations further complicated the picture. Effective March 1, 1979, DOE amended the

---

**1.** OHA indicated that a "non-spurious" claim was one where the claimant had made a "reasonable demonstration of an allocation violation." *Marathon,* at 89,050.

regulations by changing the "base period" from 1972 to the period July 1977 through June 1978. Thus, as of March 1, 1979, allocation entitlements were determined based on sales from the 1977–78 period rather than from the year 1972. This triggered a dispute between Oasis and RFI concerning their respective rights to receive gasoline from Cities and Marathon. As a result of the change in regulations, RFI's wholesale customers acquired for the first time a regulatory right to obtain gasoline from RFI based on their purchase volumes in the 1977–78 period. RFI asserted that it was entitled to receive an allocation of gasoline from Marathon and Cities in order to supply these wholesale customers as well as its remaining retail outlets. Oasis, on the other hand, maintained that RFI had transferred its entire allocation to Oasis and was not entitled to any allocation from Marathon or Cities. The uncertainties caused by this dispute, together with a shortage in the national supply of motor gasoline, resulted in a disruption of deliveries to both RFI and Oasis.

On March 21, 1979, Oasis filed suit in the 17th Judicial District of Tarrant County, Texas, seeking to enjoin RFI from interfering with its contractual rights under the October 1978 agreements. That court issued a temporary restraining order barring RFI from interfering with Oasis' rights under the Substitute Supplier Agreement. Oasis also filed an application for a temporary stay of the regulations with OHA. Some of RFI's customers, including Lucky Stores, also sought relief from DOE. The Economic Regulatory Administration responded by issuing assignment orders directing Marathon to bypass RFI and to supply Lucky Stores directly. On April 12, 1979, Oasis and RFI signed a settlement agreement which provided that Oasis would receive all motor gasoline that either Oasis or RFI was entitled to obtain from Cities and Marathon pursuant to supply contracts or DOE regulations. In addition, Oasis agreed to sell to RFI 36 million gallons of gasoline annually in three-million-gallon increments per month. This settlement agreement was approved by the state district court and the suit was dismissed.

Oasis sought approval of the settlement agreement from DOE.

The settlement agreement proved to be short-lived. The three-million-gallon monthly limit apparently proved inadequate to meet the needs of RFI's wholesale customers. RFI was unable to meet its note payments to its three suppliers. On June 11, 1979, Marathon and the two other suppliers filed suit against RFI seeking accelerated payment on the note. In an effort to resolve the dispute, the ERA convened a hearing on June 12, 1979, in which Oasis, RFI, Marathon, Cities and Champlin presented arguments. On June 19, 1979, Oasis brought suit in the U.S. District Court for the Northern District of Texas seeking relief against RFI and seeking to enjoin DOE from interfering with Oasis' receipt of the gasoline from Marathon and Cities. RFI filed for bankruptcy in the district court for the Southern District of Texas on June 27, 1979. On July 5, 1979, the director of fuel allocation at ERA issued a memorandum in which he concluded that the October 1978 purchase agreement did not relieve Marathon and Cities of their base period supply obligation to RFI. The memorandum stated that ERA regional offices should issue assignment orders directing Marathon and Cities to supply RFI's wholesale customers directly until RFI re-established itself as a financially viable supplier. On August 3, 1979, the U.S. District Court for the Northern District of Texas granted Oasis' request for a preliminary injunction prohibiting DOE from issuing any orders that would divert any Marathon or Cities' gasoline from Oasis or that would require the supplier to provide gasoline to RFI's customers. On November 14, 1979, the court issued a memorandum opinion which stated that the preliminary injunction had not resolved the issue of what effect, if any, the April 1979 settlement agreement had on RFI and Oasis' obligations under DOE regulations. In a memorandum dated January 9, 1980, the court stated that OHA should determine the validity of the settlement agreement under the regulations. In response, OHA convened a hearing of the interested parties. On April 11, 1980, OHA

issued a decision which held that, while the October 1978 agreement in fact transferred the allocation entitlements of the 84 retail outlets to Oasis, the agreements did not alter any other supplier/purchaser relationship between RFI and its suppliers. With respect to the April 1979 settlement agreement, OHA found that the agreement was a private contract that could not alter regulatory rights and obligations without DOE approval.

On review, the district court declined to follow most of OHA's findings on the ground that OHA had not been directed to address any issue other than the April 1979 settlement agreement. RFI appealed to this court, which reversed the district court. *Oasis Petroleum Corp. v. U.S. Department of Energy*, 718 F.2d 1558 (Temp.Emer.Ct.App.1983). We concluded that the district court should have first entrusted the entire matter to the OHA under the doctrine of primary jurisdiction, and we remanded the case for further proceedings. *Id.* at 1567. We emphasized, however, that our analysis of the issues presented was "in no way to be construed as an expression of opinion on how the merits of the case should ultimately be resolved." *Id.*

When the matter was sent back to the agency, OHA concluded that neither the substitute supplier agreement nor the settlement agreement had fully extinguished the supplier/purchaser relationship between RFI and Cities and Marathon: "[T]o the extent that Cities and Marathon had base period supply obligations to stations in addition to the 84 sold to Oasis, those two firms remained the suppliers to those stations after the execution of the October 1978 Agreements." *Lucky Stores, Inc.*, 14 DOE ¶ 82,505 (1986). Although the allocation entitlements relating to the 84 stations sold to Oasis had in fact vested in Oasis, the regulations did not allow an allocation belonging to an ongoing firm to be assigned without the express approval of

DOE.[2] OHA noted that a supplier/purchaser relationship under the regulations generally could not be terminated without approval of DOE. As to RFI's wholesale business, OHA concluded that RFI did not intend to transfer its wholesale business to Oasis through the October 1978 agreements. As for the April 1979 settlement agreement, OHA ruled that the agreement did not terminate the relationships of the parties under the regulations because it was not approved by DOE.

In 1986, Oasis filed for bankruptcy. Two years later, RFI and Oasis settled all of their outstanding disputes. As part of that settlement, RFI's proof of claim in the amount of $10.5 million was allowed in Oasis' bankruptcy proceeding and RFI's estate received the court-escrowed profits from Oasis' sales of gasoline to RFI's wholesale customers.

### III. *The OHA Ruling Denying RFI's Claim for Refund.*

On January 21, 1987, RFI filed an application for a refund in the Marathon special refund proceeding. As previously mentioned, OHA denied the claim, finding that RFI had not met its burden of convincing OHA that the claim was "non-spurious." OHA concluded that although the supplier/purchaser relationship between Marathon and RFI had never been terminated, Marathon nevertheless had defenses to any action by RFI alleging that Marathon's refusal to supply RFI with gasoline constituted a regulatory violation.

OHA ruled that a combination of the following provided Marathon with defenses against RFI's allegations: (i) RFI's delinquency on its note obligation during the period March 1, 1979, to March 22, 1979; (ii) the March 21, 1979, TRO issued by the Texas state court, restraining RFI from interfering with Oasis' claimed contractual rights to the disputed allocation; (iii) the April 12, 1979 Settlement Agreement, pur-

---

**2.** The allocation entitlements associated with RFI's operation of the 84 retail outlets sold to Oasis were transferred to Oasis under the regulations. Because RFI "went out of business" with respect to those outlets and Oasis immediately established the "same ongoing business" at the sites of the 84 outlets, the transfer of these entitlements was effective without DOE approval. *See* 10 C.F.R. §§ 211.11(c), 211.106(c), and 211.106(e) (1979).

suant to which RFI agreed not to seek the disputed allocation from Marathon, thereby permitting the inference that product was not requested and, accordingly, was not denied; (iv) the existence of ERA orders requiring Marathon to supply Lucky Stores rather than RFI; and (v) the August 3, 1979 order of the U.S. District Court for the Northern District of Texas, effective through decontrol, that required Marathon to supply Oasis rather than RFI. OHA rejected RFI's argument that the *Lucky Stores* decision (14 DOE ¶ 82,505 (1986)) had held that Marathon's refusal to supply RFI was a regulatory violation: *"Lucky Stores* merely holds that Marathon and RFI had a supplier/purchaser relationship. That holding does not address legal bases that Marathon might have for failing to supply given volumes of product...." *Marathon* at 89,051. OHA concluded that "there is an insufficient nexus between RFI's injury and an allocation violation to warrant the requested relief." *Id.* at 89,-058.

### IV.  *Arguments on Appeal.*

RFI argues that Marathon would have had no defenses to the alleged regulatory violations. RFI attempts to make its point by focusing almost exclusively on the month of July 1979.[3] In that month, RFI argues, Marathon clearly had no excuse for failing to deliver gasoline to RFI. RFI argues that its default on its note to Marathon would not have provided Marathon with a defense in July because Marathon did not obtain DOE's approval before terminating deliveries to RFI and because of RFI's bankruptcy filing on June 27, 1979. RFI maintains that a supplier is not relieved of its supply obligations to a bankrupt purchaser if the purchaser arranges proper payment for sales made after entry into bankruptcy. RFI argues that such financing was in place in July of 1979 under an agreement with Delta Oil Co. Next, RFI points out that the July 17, 1979, assignment order from the ERA required Marathon to supply Lucky Stores with 897,939 gallons of gasoline in July. RFI

contends that even if the assignment order relieved Marathon of its duty to deliver that amount of gasoline, Marathon was still obligated to deliver over 2 million gallons that were not subject to the order. Thus, RFI concludes, the July 17 assignment order would not completely excuse Marathon's failure to deliver gasoline. Finally, RFI argues that the settlement agreement reached in the state court suit would not provide Marathon a defense because that agreement could not legally alter the obligations of the parties under the regulations. To the extent it purported to do so it was void under Texas law. Moreover, RFI's conduct made clear at least by July of 1979 that it was seeking its entitlements from Marathon.

RFI also takes issue with OHA's conclusion that "there was an insufficient nexus between RFI's injury and an allocation violation to warrant the requested refund." *Marathon,* 19 DOE ¶ 85,575 at 89,058. RFI argues that Marathon's mistaken delivery of the gasoline to Oasis instead of RFI was an allocation violation that directly caused RFI to lose profits on the undelivered product. As such, RFI contends, DOE has a duty under PODRA (the Petroleum Overcharge Distribution and Restitution Act, 15 U.S.C. § 4501 et seq.) to make restitution to RFI for those lost profits.

### V.  *Standard of Review.*

The standard of judicial review in this case is governed by Section 211(d)(1) of the Economic Stabilization Act of 1970, which provides:

> [N]o order of [DOE] shall be enjoined or set aside, in while or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

12 U.S.C. § 1904 note. This section clearly limits the role of the federal courts in reviewing determinations that are entrusted to an agency. In light of this provision, the court should "recognize the administra-

---

**3.** In its reply brief, RFI also apparently asserts that Marathon had no justification for its refus-

al to supply RFI during the time periods March 1–21, April 6–12, and July 1–August 3, 1979.

tive expertise of an agency decisionmaker and consequently accord the agency's determination 'great deference.'" *Behm Family Corp. v. DOE*, 903 F.2d 830, 833 (Temp.Emer.Ct.App.1990) (*citing Exxon Corp. v. DOE*, 802 F.2d 1400, 1407 (Temp.Emer.Ct.App.1986)). In other words, "the judicial role requires approval of the DOE's decision if there is a rational basis for it." *Behm*, 903 F.2d at 833 (*citing Thriftway Co. v. DOE*, 867 F.2d 1577, 1580 (Temp.Emer.Ct.App.1989)).

VI. *Discussion.*

We first address whether there was a rational basis for OHA's conclusion that Marathon's failure to deliver gasoline to RFI was justified in light of RFI's default on its October 1978 note. This conclusion was based on OHA's application of the "normal business practices" rule, 10 C.F.R. § 210.62, which provides in part:

> Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter.... Nothing in this paragraph shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for allocated products, as customarily associated with that class of purchaser during the base period....

OHA noted that prior to the execution of the October 1978 agreements, Marathon had suspended sales to RFI because of its indebtedness to Marathon of over $900,000. Marathon agreed to forego seeking immediate payment of that indebtedness because it believed that the 1978 agreements relieved it of any obligation to supply RFI.

*Marathon* at 85,575. OHA found that "[i]t is unlikely that Marathon's normal business credit practices would have required Marathon to supply RFI during any period in which RFI was in default on the note." *Id.* OHA concluded that because RFI was in default on the note from at least March 1, 1979 to March 22, 1979, Marathon was relieved of its obligation to supply RFI under the normal business practices rule during that time period.

RFI does not specifically object to any of OHA's factual findings. Rather, RFI sets forth two arguments as to why it believes OHA's conclusion on this issue was incorrect. First, RFI argues that Marathon could not terminate deliveries of gasoline to RFI under the regulations without the express approval of DOE. Second, RFI asserts that its declaration of bankruptcy on June 27, 1979, precludes any reliance on RFI's default as justification for Marathon's refusal to deliver gasoline.[4]

■ RFI's first argument concerns Marathon's suspension of deliveries to RFI. DOE contends that under the "normal business practices" rule, Marathon was justified in terminating deliveries even though DOE had not approved of it. DOE's ruling in *Mack C. Colt*, Interpretation No. 78–56, 5 Energy Mgmt. (CCH) ¶ 56,447 (1978), lends support to OHA's determination that Marathon was justified in terminating deliveries to RFI even in the absence of prior approval by DOE. In *Mack C. Colt*, DOE concluded that a supplier of crude oil could properly cease deliveries of crude oil to a supplier based on the supplier's failure to arrange proper credit. DOE noted: "The provisions of § 210.62(a) therefore *grant to suppliers* the right to terminate sales to purchasers who do not arrange proper

---

**4.** We note that OHA stated in its findings that Marathon had a defense arising "at the very least, for the period from March 1, 1979 to March 22, 1979, when RFI was in default on the note." *Marathon*, at 89,053. It thus appears that OHA relied on the note default as providing a defense to Marathon only during this period in March. If this was the case, RFI's argument concerning the effect of its bankruptcy filing in June of 1979 would be irrelevant to OHA's opinion.

Both parties have addressed the bankruptcy issue, however, apparently based on the belief that OHA relied more extensively on the note default. There is some language in the OHA ruling that could be taken as an indication that the default provided a defense for periods other than in March of 1979. *See e.g., Marathon* at 89,050 ("These defenses overlap and vary depending on the circumstances in existence at any given time.") We therefore proceed to deal with the bankruptcy issue.

credit or payment terms customarily associated with sale of that product to that purchaser." *Id.* at 56,448 (emphasis added). Although the ruling cautioned that "suppliers should seek an interpretation" from DOE before terminating a crude oil supplier/purchaser relationship, it did not require DOE approval as a prerequisite to suspension of deliveries. *Mack C. Colt* may reasonably be interpreted as authorizing a supplier, in appropriate circumstances, to suspend deliveries to a purchaser under § 210.62(a).[5] *Cf. Thriftway Co. v. DOE*, 867 F.2d 1577, 1580–81 (Temp.Emer. Ct.App.1989) (The courts afford great deference to the agency's interpretation of its own regulations.) We find that insofar as OHA's opinion found that Marathon would have had a defense under § 210.62(a), the ruling was supported by a rational basis.

▪ RFI's second argument, pertaining to the effect of the bankruptcy filing, requires an examination of a DOE interpretive ruling. RFI relies on *Yellow Cab Co. of Philadelphia*, Interpretation 78–57, 6 Energy Mgmt (CCH) ¶ 56,448 (1978), which involved a purchaser of gasoline, Yellow Cab, that filed for bankruptcy. Yellow Cab's supplier was Gulf Oil. Gulf discontinued deliveries of gasoline after Yellow Cab declared bankruptcy, citing concerns that Yellow Cab had not made adequate arrangements to pay for gasoline that had previously been delivered. DOE ruled that

Gulf could not suspend deliveries of gasoline to Yellow Cab, finding that with only two exceptions Yellow Cab had made all payments to Gulf in accordance with the normal business practices in effect between the parties. DOE noted that the bankruptcy court accorded future payments priority status—which protected Gulf against loss—and that since the bankruptcy filing Yellow Cab had made all payments to Gulf on a timely basis. DOE also noted the lack of any previous disruptions in the business relations between the two parties. According, to RFI, *Yellow Cab* means that the filing of RFI's bankruptcy petition prevented Marathon from suspending deliveries of gasoline to RFI.

RFI interprets *Yellow Cab* too broadly. It cannot be interpreted as establishing a blanket rule barring the termination of deliveries to bankrupt purchasers. DOE noted in *Yellow Cab* that whether the failure to pay a supplier for deliveries will result in a termination of the supplier/purchaser relationship will be determined on "a case by case basis" with the focus upon "whether there has been a substantial deviation from normal credit practices to the detriment of the supplier." *Id.* at 56,635. In RFI's case, unlike *Yellow Cab*, it can be said that there was a substantial deviation from normal credit practices. OHA recounted the long-running financial difficulties RFI experienced from 1977–79 and concluded that

---

5. Another DOE ruling cited by RFI, *Texaco, Inc.*, 6 DOE ¶ 82,564 (1980), does not alter this conclusion. RFI points to a footnote in *Texaco* as authority for its argument that prior DOE approval was required before deliveries of covered products could be suspended by a supplier. In the *Texaco* case, Texaco argued that § 210.62(a) authorized it (without DOE approval) to suspend deliveries of crude oil to a purchaser that had failed to pay for past deliveries. DOE did not reach the merits of Texaco's argument; instead DOE granted Texaco's request for relief on the grounds that the order from which Texaco appealed had not adequately addressed the issues presented. After its conclusion that the order in question was deficient and required reversal, DOE stated in the footnote: "We do not intend by this decision to lend support to the interpretation of 10 C.F.R. § 210.62(a) advanced by Texaco." After noting that it had allowed purchasers to impose more stringent credit terms and to seek exception relief in cases

of willful nonpayment, DOE stated, "Texaco has not cited, nor has our examination of DOE regulations revealed, any evidence in support of Texaco's position that 10 C.F.R. § 210.62(a) permits a supplier to suspend deliveries of allocated products when a purchaser fails to pay for past deliveries." *Id.* at 85,197 n. 4. The footnote in question, which is found at the end of the opinion, must therefore be regarded as dicta. Placed in context, it certainly does not stand for the proposition advanced by RFI. We note that the *Mack C. Colt* decision was apparently not cited to DOE in the *Texaco* hearing.

We are likewise unpersuaded that 10 C.F.R. § 211.9(a)(2)(i), cited by RFI in its Reply Brief, merits reversal of OHA's ruling. We see no indication that RFI raised this argument in the administrative process or in the district court. We will not presume on this scant record that OHA's application of § 210.62(a) is inconsistent with § 211.9(a)(2)(i).

Marathon's normal business practices would have been to terminate deliveries of product when RFI was in default on the note. Although it is true, as RFI argues, that the effect of the bankruptcy stay was to prevent Marathon from attempting to collect the debt represented by the note, it does not follow that Marathon was prevented from terminating deliveries of gasoline to RFI. *Yellow Cab* clearly does not establish such a hard and fast rule. Although the particular facts of *Yellow Cab* precluded the supplier in that case from terminating deliveries to the purchaser, the OHA in the instant case made factual findings that serve to distinguish this case from *Yellow Cab*.[6] These findings are supported by record evidence. It cannot be said that OHA's opinion is untenable because of *Yellow Cab*.

■. RFI's next argument is that the July 17, 1979, assignment order issued by ERA would not have provided Marathon a defense for July because the amount of RFI's alleged entitlement in that month exceeded the amount of the July 17 order. This argument fails to address OHA's findings in two important respects. First, OHA did not purport to examine the effect of the assignment orders as they related to a monthly allocation entitlement. Rather, OHA found that, "At the very least, these orders provide the basis for a Marathon defense that its supply obligations pursuant to the updated base period were reduced by 7,614,803 gallons." *Marathon*, at 89,054. RFI simply does not address this conclusion. The second aspect of OHA's findings left unaddressed by RFI is OHA's view of the significance of the series of agency rulings directing Marathon to bypass RFI: "[W]e rely on the assignment orders and the July 5, 1979 memorandum for the proposition that, when the ERA considered the matter, it declined to order Marathon to supply RFI but rather provided that where necessary Marathon should be ordered to supply RFI's downstream customers directly." *Id.* OHA concluded

that these facts provided a defense to Marathon because "its supply obligations were affected by agency orders." *Id.* Again, RFI's argument fails to address the basis upon which OHA made its determination. Insofar as the OHA opinion relied on the assignment orders as providing Marathon with a defense to an action for regulatory violations, we find that the opinion is supported by a rational basis.

■ RFI next challenges OHA's finding that the April 12, 1979, settlement agreement relieved Marathon of its duty to supply RFI. The settlement agreement was simply a private contract, RFI argues, and could not alter the duties imposed on Marathon by the allocation regulations. But OHA found that "[t]he April 12, 1979 Settlement Agreement clearly provided the basis for a defense by Marathon. Marathon could reasonably contend that to attempt to supply RFI rather than Oasis would have been inconsistent with the May 17, 1979 Court Order and, therefore, would have been a futile act." *Marathon*, at 89,054. OHA reasoned that RFI could not have accepted the gasoline even if Marathon had offered it because to do so would have violated either the TRO issued by the Texas state court or the subsequent settlement agreement.

OHA's finding that Marathon had a defense arising out of the Texas litigation is supported by a rational basis. Although it is true that suppliers and purchasers could not simply alter through agreement the duties imposed on them by the regulations, Marathon and RFI were bound to act in conformity with the lawfully obtained orders of the Texas state court and the court-approved settlement agreement. OHA recognized in its opinion that the district court's order was incorrect, but found that RFI and Marathon were nonetheless bound to observe it while it was in effect:

> The fact that the state court was incorrect, however, cannot change the fact that the state court issued an order that

---

6. This undercuts RFI's contention that its marketing agreement with Delta precluded application of the "normal business practices" rule. As RFI notes in its brief, the ERA concluded on

July 5, 1979 that it was doubtful that the suppliers, including Marathon, would accept Delta's support in light of RFI's current financial obligations to them.

precluded RFI from seeking product from Marathon. If RFI would have even sought, let alone purchased, product from Marathon, RFI would have violated the TRO and its subsequent agreement with Oasis that became part of the court's order dismissing the case.

*Marathon,* at 89,053. RFI has not cited any authority challenging the conclusion that Marathon's compliance with the court's order served as justification for its failure to deliver the gasoline to RFI. No contention is made that the recognition of such a defense was outside of the agency's authority. Furthermore, the fact that the court's order was dissolved and replaced by a settlement agreement does not foreclose this defense. OHA was certainly justified in concluding that Oasis would have obtained an order from the Texas court preventing RFI from receiving any of the disputed allocation from Marathon. *Id.* at 89,054. In short, we see no basis for reversing the agency's determination.

RFI's final argument concerns the finding of the agency that there was an insufficient nexus between RFI's alleged injury and an allocation violation to warrant granting RFI restitution. RFI believes that the agency's finding contradicts DOE's obligation to make restitution to injured persons. *See* 15 U.S.C. § 4501 et seq. (PODRA). We agree with DOE, however, that RFI's argument is dependent upon some showing of a regulatory violation by Marathon. Because OHA's determination that Marathon had defenses to any action for a regulatory violation is supported by a rational basis, we must reject RFI's "nexus" argument.[7]

RFI also argues that it is entitled to recover because it seeks direct restitution, while others who stand to recover from the Marathon fund, including the federal government, will do so by way of "indirect" restitution. Although PODRA clearly establishes a preference for direct rather than indirect restitution, RFI cites no au-

thority to contradict DOE's assertion that "injured persons" entitled to recovery under PODRA are those persons who have been injured through the regulatory violations of others. Certainly nothing in PODRA undermines this assertion. Similarly, RFI has cited no authority for its argument that it should recover from the Marathon fund before the federal government does because of the "wrongful" orders issued by government agencies. We agree with DOE that the issuance of the orders and rulings in question is not the type of affirmative misconduct that would bar recovery on the part of the government and entitled RFI to recover.

In order to obtain restitution, RFI had to make the minimum required showing of a regulatory violation by Marathon. As we have discussed at length, OHA found no regulatory violation. That determination was supported by a rational basis. Moreover, it is clear to us that OHA considered all of the equitable concerns raised by RFI in its appeal, but determined that under the circumstances RFI was not entitled to restitution. As we noted earlier, § 211(d)(1) of the Economic Stabilization Act limits the role of the federal courts in reviewing determinations that are entrusted to an agency. "The judicial role requires approval of the DOE's decision if there is a rational basis for it." We are satisfied that the agency's determination in this case was supported by a rational basis.

We have considered the other issues raised by RFI in its brief and we find them to be without merit.

### VII. *Conclusion.*

The judgment of the district court is AFFIRMED.

---

7. RFI's argument that Marathon violated the "surplus product" regulations (10 C.F.R. § 211.-10(f)(2) & (g)) was not raised before the agency in the administrative process. We therefore de-

cline to address the issue in this appeal. *Cf. Behm Family Corp. v. DOE,* 903 F.2d 830, 833 (Temp.Emer.Ct.App.1990).